IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiffs,<br><br>vs.<br><br>RIGOBERTO CERVANTES,<br><br>                Defendant. | **8:17CR103**<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on Defendant Rigoberto Cervantes' ("Cervantes") Motion to Suppress Evidence. (Filing No. 70.) Cervantes seeks to suppress all evidence and statements obtained as a result of the March 24, 2016 search of a 1996 Chevrolet pickup truck.

The Court held an evidentiary hearing on August 31, 2017. Cervantes was present with his attorney, Alton Mitchell. The United States was represented by Assistant United States Attorney Martin Conboy. A transcript (TR.) of the hearing was prepared and filed on September 26, 2017. (Filing No. 92.) This matter is now fully submitted and ready for decision.

### BACKGROUND

On March 24, 2017, Deputy Nicholas Bridgmon ("Deputy Bridgmon") of the Seward County Sheriff's Office was working as a patrol deputy. (TR. 4.) At approximately 7:17 p.m., Deputy Bridgmon was just north of mile marker 373 on Interstate 80 at an abandoned gas station. (TR. 4-5.) Deputy Bridgmon noticed a green Chevy Silverado pickup and a white minivan attempting to get gas at the abandoned station. (TR. 5.) The minivan was occupied by a family and had license plates from Hall County, Nebraska. (TR. 5.) The green pickup, driven by Cervantes, had Arizona plates. (TR. 6.) Deputy Bridgmon approached the individuals to tell them they were not going to be able to get gas at that location. (TR. 5.)

Upon contact, Cervantes provided Deputy Bridgmon his driver's license and Deputy Bridgmon ran his license through Seward County Communications. (TR. 6.) However, Deputy

Bridgmon did not get a response from Seward County Communications during his interaction with Cervantes.  (TR. 6.)  Deputy Bridgmon told Cervantes that the nearest gas station was approximately six miles east down the road at exit 379.  (TR. 7.)  After returning Cervantes' driver's license, Deputy Bridgmon and Cervantes left the area.  (TR. 7.)

A short time later, Deputy Bridgmon was contacted by Seward County Communications.  Deputy Bridgmon was told that Cervantes' driver's license was suspended and that Sergeant Brian Heath ("Sgt. Heath") of the Omaha Police Department wanted to speak to him.  (TR. 7.)  Sgt. Heath told Deputy Bridgmon that an informant had reported that the vehicle driven by Cervantes was known to carry between five to ten pounds of methamphetamine, and that the drugs may or may not be in the spare tire. (TR. 8.)  After receiving this information, Deputy Bridgmon traveled towards the gas station where he told Cervantes he could get gas.  (TR. 8.)  While in route, Deputy Bridgmon called Sergeant Mike Vance (Sgt. Vance") of the Seward County Sheriff's Office and asked Sgt. Vance to come to the gas station because he is their sole canine handler.  (TR. 8.)

When Deputy Bridgmon arrived at the gas station, he sat across the road and watched Cervantes' vehicle, as well as a tan Chevy Tahoe.  Sgt. Heath told Deputy Bridgmon that a tan Tahoe would be traveling with the green pickup.  (TR. 8.)  Deputy Bridgmon went into the parking lot and pulled his vehicle behind and to the left of the pickup and Tahoe.  (TR. 14-15.)  Another deputy pulled up and parked next to Deputy Bridgmon's vehicle.  (TR. 15.)  The officers' patrol cars did not block the pickup or Tahoe in the parking lot.  (TR. 19.)

Deputy Bridgmon testified that upon contact with Cervantes, he found Cervantes to be of average intelligence and not under the influence of alcohol or drugs.  (TR. 15-16.)   Deputy Bridgmon was in uniform and armed during his contact with Cervantes, but did not brandish his weapon or make any implied or expressed threats.  (TR. 16.)  Deputy Bridgmon stated that he did not have a problem communicating with Cervantes, who is Hispanic.  (TR. 16.)  Deputy Bridgmon testified that he asked Cervantes if there was anything illegal in his vehicle and Cervantes responded "no." (TR. 16.)  Deputy Bridgmon then asked Cervantes if he could search his vehicle, to which Cervantes said "if you want."  (TR. 17.)  When Deputy Bridgmon again asked Cervantes if he could search the vehicle, Cervantes said "go ahead." (TR. 17.)  A female

2

who had been traveling in the Tahoe, later identified as Gabriella Valdez, told Cervantes that he did not have to allow the officers to search the pickup. (Ex. 1.)

Cervantes was placed in the passenger seat of the patrol car because, as testified to by Deputy Bridgmon and reflected in the video of the encounter offered into evidence at the evidentiary hearing, it was cold outside. (Ex. 1.) Deputy Bridgmon did not force Cervantes into the car, nor did Cervantes resist entering the vehicle. (*Id*.) Thereafter, Deputy Bridgmon started searching the pickup and noticed that there was no spare tire. (TR. 17, 32.) While Deputy Bridgmon was in the back area of the pickup, Cervantes opened the passenger door of the patrol car and asked Deputy Bridgmon if he could make a phone call. (TR. 20-21.) Deputy Bridgmon told him he could make a phone call. (Tr. 21.)

Deputy Bridgmon testified that Cervantes was not handcuffed or otherwise restricted while in the patrol car, and that Cervantes was able to open the patrol door himself from inside of the vehicle. (TR. 21.) At one point, Cervantes mentioned that he was getting hot inside the patrol car. (TR. 21.) Still, he did not request to exit the vehicle. (*Id*.) The video of the encounter shows that after Cervantes indicated he was hot, the passenger door to the patrol car was cracked open. (Ex. 1.) The door remained cracked open until Cervantes was detained. (Ex. 1.) Deputy Bridgmon testified that each time officers were near the bed of the pickup or the tailgate, Cervantes would try to distract them.[1] (TR. 22.) However, Cervantes never made any attempt to withdraw or limit his consent to the search of the pickup. (TR. 25.)

Sgt. Vance testified that when he got to the scene and observed the pickup, he noticed that the screws on the plastic bed liner were not factory-type screws. (TR. 41.) Sgt. Vance also observed scarring on the screws, which indicated they were recently removed and put back in place. (TR. 42.) Sgt. Vance testified that there were non-factory metal brackets holding the plastic bed liner against the bed. (TR. 42.) The bolts holding the brackets also had scarring and were different sizes. (TR. 42.) Officers also noticed two bulges at the front of the pickup's bed

---

[1] Deputy Bridgmon testified that Cervantes kept opening the door of the patrol car, but was not saying anything. (TR. 23.) The video offered at the evidentiary hearing shows that when Cervantes was in the patrol car, his body kept hitting the open door, causing the door to move. (Ex. 2.)

and, by tapping on the outside of the bed, noted that it felt "solid." (TR. 42.) The officers thereafter removed screws from the bed liner using an electric screwdriver and observed what they believed to be methamphetamine concealed between the pickup box and the bed liner. (TR. 24.) Once the methamphetamine was discovered, Cervantes and Valdez were detained. (TR. 24.)

## DISCUSSION

Cervantes argues that his Fourth Amendment rights were violated because his contact with Deputy Bridgmon was not supported by reasonable suspicion. However, a review of the evidence makes clear that the contact between Cervantes and Deputy Bridgmon was consensual. A consensual encounter does not trigger Fourth Amendment scrutiny. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A person has only been seized within the meaning of the Fourth Amendment if, in view of all the circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. Absent such evidence, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id*. at 555.

Deputy Bridgmon made contact with Cervantes in a public place. Deputy Bridgmon was in uniform and armed during his contact with Cervantes, but did not brandish his weapon or make any implied or expressed threats. Deputy Bridgmon spoke in a calm voice and did not indicate that compliance with his requests would be compelled. Also, the patrol cars did not block Cervantes' vehicle. In short, there is nothing in evidence which indicates that the contact between Cervantes and Deputy Bridgmon was anything but consensual. Therefore, this argument has no merit.

Even assuming the encounter was not consensual, Cervantes' constitutional rights were not violated because Deputy Bridgmon had probable cause to arrest Cervantes. At the time of

their encounter, Deputy Cervantes was aware that Cervantes was driving with a suspended license in violation of Neb. Rev. Stat. § 60-4,108. *See United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) ("Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it").

Moreover, Deputy Bridgmon had reasonable suspicion to detain Cervantes. "Police may conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010). "This standard requires that officers be able to point to specific, articulable facts justifying the seizure." *Id*. "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *Id*. Deputy Bridgmon was aware that an informant had reported that that there was methamphetamine in a green pickup that was traveling with a tan Tahoe. The informant had also advised that the individual in the pickup with methamphetamine had just had law enforcement contact west of Lincoln, Nebraska, which is where Deputy Bridgmon had his initial contact with Cervantes. Deputy Bridgmon's observations were consistent with the information provided by the informant. Therefore, Deputy Bridgmon had specific, articulable facts justifying Cervantes' detention.

Cervantes further asserts that he did not voluntarily consent to the search of the pickup. Consent is voluntary if it was "the product of an essentially free and unconstrained choice" by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "This determination depends upon the totality of the circumstances in a particular case, including both the characteristics of the accused and the details of the interrogation." *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990) (internal quotation omitted). The following characteristics of persons giving consent are relevant in assessing voluntariness: (1) their age, (2) intelligence and education, (3) whether they were intoxicated or under the influence of drugs, (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights, and (5) whether, due to previous arrests, they were aware of the protections afforded to suspects by the legal system. *Id*. at 381 (internal citations omitted). In examining the environment in which consent was

5

given, courts should ask whether the individual who provided consent (1) was detained and questioned for a long or short time, (2) was threatened, intimidated or punished by police, (3) relied upon promises or misrepresentations made by police, (4) was in custody or under arrest when consent was given, (5) was in a public or secluded place, or (6) either objected to the search or stood by silently while the search was performed. *Id*. (internal citations omitted). Having considered these factors, the Court concludes that Cervantes voluntarily consented to the search of the pickup.

Cervantes is an adult with average intelligence. The officers did not have any difficulty communicating with Cervantes. Cervantes spoke English and understood what the officers were asking him. Cervantes was not under the influence of drugs or alcohol at the time consent was given. Cervantes was asked twice whether he would consent to the search, and he agreed each time. He was also told by Valdez that he did not have to allow the officers to search the vehicle. Although Deputy Bridgmon was in uniform and armed during his contact with Cervantes, he did not brandish his weapon or make any threats. Cervantes was not handcuffed or detained in anyway during the encounter. He voluntarily entered the patrol car and was able to open the door of the vehicle. Also, the door to the patrol car remained open during much of the search. Cervantes never attempted to exit the patrol car, although he was clearly able to do so. In short, the record contains no indication that Cervantes' consent was anything other than voluntary.

Cervantes contends, however, than even if consent was voluntary, the search exceeded the scope of consent because the officers removed the pickup's bed liner. "A consensual search may not exceed the scope of the consent given." *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Cervantes was able to see the search occurring and made no attempt to stop or limit the search, nor did he withdraw his consent at any time. *See Martel-Martines*, 988 F.2d at 858 (finding that the defendant granted unrestricted permission to search his truck when he watched in silence as the officers examined the truck on a hoist, lowered it, and prepared to puncture


sheet metal that covered a secret compartment). Cervantes was able to speak to officers throughout the search and the door to the patrol car remained open much of the time. At one point, Cervantes even asked officers if he could make a phone call. Cervantes' failure to object to the search made it objectively reasonable for the officers to conclude that his general consent to search the pickup included removal of the bed liner. Also, the removal of the screws from the pickup was not destructive in any way as the screws and bed liner could be put back in place.

Additionally, even if one could argue that Cervantes' consent did not extend to the removal or the bed liner, by that time, the officers had probable cause to support a warrantless search of the pickup bed. Probable cause exists when, "given all the circumstances, there is a fair probability that contraband will be found in a particular place." *United States v. Walker*, 900 F.2d 1201, 1204 (8th Cir. 1990). "Information gathered during a consensual search can provide probable cause to search a vehicle more thoroughly or even to arrest its occupants." *Martel-Martines*, 988 F.2d at 859. In examining the vehicle, officers noticed after-market screws that showed signs of scarring. There were non-factory metal brackets holding the plastic bed liner against the bed. The bolts holding the brackets also had scarring and were different sizes. They also noticed two bulges at the front of the pickup's bed and, by tapping on the outside of the bed, noted that it felt "solid." (TR. 42.) The information gathered by the officers when examining the outside of the pickup supplied them with reasonable suspicion to conduct a more thorough search.

Therefore, for the reasons set forth above,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge John M. Gerrard that Defendant's Motion to Suppress Evidence (Filing No. 70) be denied.

Dated this 25th day of October, 2017.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.